UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

SHAKIR HASAN,

                           Petitioner,            **REPORT AND RECOMMENDATION**
                                                          **08-CV-613 (DLI)(LB)**

    -against-

LUIS MARSHALL, Superintendent,
Sing Sing Correctional Facility,

                           Respondent.

----------------------------------------------------------X

**BLOOM, United States Magistrate Judge:**

This *pro se* petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 was referred to me for Report and Recommendation in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully recommended that the petition should be denied.

## BACKGROUND

On February 8, 2001, Lamont Sawyer (hereinafter "Sawyer"), entered a laundromat (Tr. at 152)[1] located at 404 Nostrand Avenue between Monroe and Gates, in Brooklyn, New York. Tr. at 346. He asked the woman who was in the laundromat if he could use the bathroom. Tr. at 153. She said that the bathroom door was locked, but Sawyer tried to open it anyway. Id. As Sawyer walked out of the laundromat, he saw Shakir Hasan (hereinafter "petitioner" or "Shakir") talking to the woman. Sawyer knew the woman was Shakir's mother and the owner of the laundromat. Tr. at 152. During this conversation, petitioner's mother pointed at Sawyer and said, "he tried to rob me" as Sawyer walked out of the laundromat. Tr. at 349-50. Petitioner

---

[1] "Tr." refers to the transcript of the jury trial held February 26 – March 3, 2003.

approached Sawyer and asked him what the problem was. Tr. at 351. While speaking to Sawyer, petitioner received a cell phone call from his brother and he told his brother to come downstairs. Id. According to Sawyer, petitioner then reached into his pocket, for what Sawyer believed to be a weapon, causing Sawyer to run away as petitioner yelled "I'm gonna get you, I'm gonna get you." Tr. at 153-54. In contrast, petitioner testified at trial that he neither chased Sawyer, nor threatened him. Tr. at 352.

Around 7:00 p.m. on February 10, 2001, Sawyer was walking on the corner of Quincy and Nostrand Avenue when he saw an individual standing between two phone booths. Tr. at 155. The individual lifted his head, stepped out of the shadows, and said, "what now?" Id. Sawyer put his hands up because he thought the individual was going to throw a punch, but instead the individual extended his hand, which held a pistol, and pointed it directly at Sawyer's eyes. Tr. at 156. Sawyer tried to knock the gun out of the individual's hand, but the gun went off and Sawyer was shot through his chin. Tr. at 157. Sawyer ran away as the individual chased him and continued to shoot at him. Tr. at 158. As he was running, Sawyer was shot in the leg and then, in the spine. Tr. at 159-60. Sawyer curled up into the fetal position as the individual stood over him and fired three more shots. One shot hit Sawyer's waist, another his thigh, and a third hit his walkman. Tr. at 161. A police officer arrived a few minutes later and asked Sawyer who shot him. Tr. at 162-63. Sawyer answered it was Shakir from the laundromat. Tr. at 163.

In contrast, petitioner testified at trial that he never saw Sawyer at any time after the incident on February 8, 2001, until Sawyer testified at petitioner's trial. Tr. at 352. However, petitioner stated that he and Sawyer grew up in the same neighborhood and knew each other

since they were teenagers. Tr. at 368. Petitioner testified that at the time Sawyer was shot, he was at a birthday party for the daughter of Michelle Smith (hereinafter "Smith"). Tr. at 353. Petitioner stated that on February 10, 2001, he met Smith around noon when he was driving and Smith flagged him down and asked him for a ride to pick up things for the party. Tr. at 354 Petitioner agreed and drove Smith to pick up the items. Id. Petitioner and Smith returned to Smith's apartment around 4:00 p.m. Tr. at 354-55. The party, which included a handful of kids and adults, lasted from about 6:00 p.m. until about 8:45 p.m., during which time petitioner was acting as the party's disc-jockey. Tr. at 355, 357. The adults at the party included petitioner, Smith, and two women named Shannel Seabrooks and Doris Briggs (hereinafter "Seabrooks" and "Briggs"). Tr. at 355. There was no bathroom inside Smith's apartment, but there was one down the hall. Tr. at 356. Petitioner stated that he only left the apartment to use the bathroom during the party. Tr. at 356-57. Smith's apartment, where the party was held, was located at 200 Putnam in the Bedford Styuvesant section of Brooklyn. Tr. at 354-55. 200 Putnam is about four or five blocks from Nostrand and Quincy, Tr. at 362, where Sawyer was shot. Tr. at 155. Petitioner remained at Smith's apartment after the party ended. Tr. at 387. Around 11:00 p.m. on February 10, 2001, petitioner learned that the police were looking for him. Tr. at 357, 359. Petitioner turned himself in to police on a later date. Tr. at 359-60.

Petitioner pled not guilty to the charges that he shot Sawyer and testified at trial. Petitioner testified that he never left the party on Saturday night except for "a few seconds" to use the bathroom. Tr. at 388-89. Although petitioner's defense counsel Ivan Vogel (hereinafter "Vogel"), had given the District Attorney's Office notice of an alibi witness who was present at the courthouse during the trial, Tr. at 405, Vogel rested without calling the alibi witness. Tr. at

3

401-02. As a result, with Vogel's consent, the court gave a missing witness charge to the jury. Tr. at 411. The court instructed the jury as follows:

> There's evidence in this case that another person was present at the time that the defendant says he was at this party and her name is Michelle Smith. Her testimony, had she been called by the defense as a witness, could possibly be a material help in assistance to the jury. In deciding this issue you may not under the law speculate or guess as to what, or how, Michelle would have testified if called. However, from the failure of the defendant to call Michelle Smith the law permits, but does not require you to infer if you believe it proper to do so, that if Michelle Smith had been called as a witness by the defendant, and had testified, her testimony would not have supported the testimony of the defendant on this issue as to where the defendant was on that night. You may so only infer if you are satisfied that Michelle Smith was under the control of the defendant, and control meaning, in effect, she would testify favorably on defendant's part and was available to be called by the defendant if he wished to do so. In that regard you must consider the explanation offered by defense during the trial for the failure to call Michelle Smith. If the explanation satisfies you that Michelle Smith was not under the control of the defense or unavailable to be called as a witness for the defense you must draw no adverse inference from the failure to call Michelle Smith.

Tr. at 472-73. Vogel addressed the missing witness charge in his closing argument, stating that petitioner testified himself that he was at the party during the time of the shooting and that he only left the party to use the bathroom. Tr. at 437. Vogel stated that no one, including Smith, watched petitioner's every move throughout the entire party. Tr. at 437-38. Vogel argued that if petitioner wanted to make up a story, he would have put himself further from the crime scene than Smith's apartment. Tr. at 438. The jury found petitioner guilty. Tr. at 492. Petitioner was sentenced to twelve and a half years in prison followed by two and a half years of post-release supervision. Petition for a Writ of Habeas Corpus at 1.

4

## PROCEDURAL HISTORY

Petitioner appealed his conviction to the Appellate Division, Second Department. On appeal, petitioner claimed that his conviction should be set aside as against the weight of the evidence. Petitioner also claimed that he was denied a fair trial by, *inter alia*, the admission of police testimony that Sawyer identified petitioner as the shooter. People v. Hasan, 17 A.D.3d 482 (2d Dept. 2005). On April 11, 2005, the Appellate Division, Second Department rejected petitioner's arguments and affirmed his conviction. Id. In addition to holding the evidence was sufficient to convict petitioner and the excited utterance admissible, the court held that the remainder of petitioner's claims were either unpreserved or without merit. Id. Petitioner's request for leave to appeal to the New York Court of Appeals was denied on November 10, 2005. People v. Hasan, 5 N.Y.3d 882 (2005).

On February 27, 2007, petitioner moved to vacate his conviction pursuant to New York Criminal Procedure Law §440.10(h). Petitioner claimed that the conviction was obtained in violation of his right to effective assistance of counsel under the Sixth Amendment of the United States Constitution because Vogel accepted the court's missing witness charge and failed to call Smith, his alibi witness. Petitioner filed his own affidavit, and that of Michelle Smith, to rebut the presumption that defense counsel rendered adequate assistance of counsel. On November 7-9, 2007, the trial court conducted a hearing on petitioner's motion.

At the evidentiary hearing, petitioner, Smith, and Vogel testified. Petitioner testified that he was at Smith's daughter's birthday party at the time of the shooting. Hearing (hereinafter "H.")[2] at 8, 10. Petitioner also testified he knew Vogel spoke to Smith about his alibi, H. at 8-9,

---

[2] "Hearing" refers to the transcript of the evidentiary hearing held on November 7-9, 2007.

and that Smith was inside the courthouse, but outside the courtroom, the day petitioner testified at trial. H. at 10-11. Petitioner stated that Smith was outside the courtroom because "it was already set that she was going to come in, testify." H. at 11 After petitioner's testimony, the court took a recess during which Vogel told petitioner, over petitioner's objections, that he was not going to let Smith testify and that petitioner's testimony would be good enough. H. at 11-13.

Cross-examination of petitioner revealed inconsistencies between his story and Smith's story about how petitioner and Smith met each other on February 10, 2001, H. at 23-25, and whether or not petitioner spent the night at Smith's house on February 10, 2001. H. at 29-32. Petitioner testified that he and Smith never had a sexual relationship. H. at 27. He also testified that he never asked Vogel to call any witnesses other than Smith, even though there were other adults at the birthday party. H. at 47-49.

In contrast, petitioner stated on re-direct that at some point prior to trial, he spoke with Vogel about calling all of the alibi witnesses and Vogel replied that he had an investigator who would look into the alibi witnesses. H. at 60-62. Petitioner testified that when the trial began, Vogel informed him that he was unable to contact any of the female alibi witnesses who were at the party besides Smith. H. at 62, 67. However, petitioner also testified that he did not make an effort to find out the names and addresses of the other people from the party during the two years he was released on bail prior to trial. H. at 70-73. Re-direct also revealed that after the party was over, petitioner, Smith, Briggs, and Seabrooks remained at Smith's apartment where petitioner helped Smith move her furniture back into her apartment, which had been placed upstairs in Seabrooks' apartment for the duration of the party. H. at 62-65. Petitioner stated that moving the furniture took "maybe about ten minutes the most." H. at 64.

6

Michelle Smith testified after petitioner. Smith stated that she was twenty-four years old, was employed as a doll-hairstylist, and had two children, neither of whom was biologically related to the petitioner. H. at 79-80. Smith had known petitioner since 1994, was aware that he was charged with committing attempted murder on February 10, 2001, and had spoken to him after he was charged with the crime. H. at 80.

Smith stated that she was with petitioner on February 10, 2001. Id. On that day, when Smith saw petitioner driving by her home, she stopped him and asked if he would help her get things for her daughter's birthday party and he agreed. H. at 81. The party started between 5:45 and 6:00 p.m. and lasted until 8:45 p.m. H. at 83, 84. Smith stated that petitioner was in the apartment when people started to arrive and only left the party to use the bathroom, H. at 84, which was located down the hall on the same floor. H. at 82. After the party was over, Smith, her mother, her daughter, and petitioner remained in the apartment. H. at 85. Smith testified that before the party started, she put some of her furniture upstairs in Seabrooks' apartment and that she, her mother, and petitioner moved it back into Smith's apartment after the party was over, which took "about an hour." H. at 86-87. Subsequently, petitioner took a shower, Smith took a shower, and they went to bed. H. at 87. Smith testified she did not have sex with petitioner on the night of February 10, 2001, but that they had a sexual relationship in the past. Id.

Smith testified that Vogel's investigator, Kevin Hinkson (hereinafter "Hinkson"), interviewed her at her home and she told him she spent February 10, 2001 with petitioner and that petitioner was at her daughter's birthday party. H. at 88. Hinkson asked for the names of the other adults at the party. H. at 89. Smith gave him Seabrooks' name, but she did not give him Seabrooks' phone number. H. at 89-90. Smith gave Hinkson her mother's phone number, but

7

not her address. H. at 91. Smith did not give Hinkson Briggs' phone number or address because she did not know them, as Briggs was a friend of Seabrooks. H. at 126-27. Smith asked Seabrooks for Briggs' contact information and Seabrooks said she would "work on getting it." H. at 127. Smith testified that at some point she gave Briggs' number to Hinkson. H. at 130-31.

Vogel called Smith both a week before the trial and the day before the trial and told her that he wanted her to be a witness, but did not discuss her testimony. H. at 92, 93. Smith testified that she remained outside the courtroom everyday of the trial, but Vogel never spoke to her until the last day of trial, at which point he told her to go home because her testimony would not make a difference at that point. H. at 94-95.

However, cross-examination revealed that Vogel spoke to her at least twice a day during the trial, H. at 100, and that she stated in her affidavit she "spoke to Vogel over the telephone at least three times, one week before trial, the night before the trial, and then in court." H. at 102. Smith also stated on cross-examination that she had a sexual relationship with petitioner, which ended a few months prior to February 10, 2001. H. at 116, 117. Smith testified that she never told Vogel petitioner was supporting her financially or that she would say anything to help him. H. at 117.

Vogel testified last that he was a licensed attorney who had been practicing criminal law in New York for approximately twenty years. H. at 137. He stated that he did not recall the precise date that petitioner told him he had an alibi, but remembers serving an alibi notice to the court. H. at 144-45. Vogel testified that he knew there were more alibi witnesses than just Smith and that he told Smith he needed the names, addresses, and phone numbers of the other people who were at the party. H. at 150-51. Vogel said that Smith gave him her mother's phone

8

number and Briggs' name, but told him they did not want to get involved. H. at 151, 186-87. Hinkson wrote reports regarding Briggs and Smith, which included their contact information, that were introduced at the hearing as Defendant's Exhibits C and D respectively. H. at 149. Vogel testified that he spoke with Seabrooks, H. at 195-96, and asked Briggs to come to court to testify at petitioner's trial, but she refused. H. at 153. Vogel did not subpoena her because he did not know her address, as she had moved since Hinkson's report was written. H. at 153-54. Because the other witnesses stated that they did not want to get involved or refused to testify, Vogel became concerned regarding the alibi. H. at 182.

There were differences between petitioner's story and Smith's story as to the events that took place on February 10, 2001 and Vogel believed that those differences raised credibility issues. H. at 159. The differences included the fact that petitioner told Vogel that he left the party to use the bathroom while Smith said petitioner never left the room and that she had her eyes on him the entire time Id. Moreover, Vogel thought that Smith's sexual and financial relationship with petitioner, in addition to the fact that she told Vogel "I'll say anything for him," destroyed her credibility. Id. Vogel testified that he examined the totality of the circumstances and tried to anticipate what the assistant district attorney would do with Smith's testimony on cross-examination. H. at 162.

In addition, Vogel testified he was concerned that Smith's credibility would be undermined if the other adults at the party did not testify, H. at 178-79, 182, especially since the party was four to five blocks from the crime scene. H. at 183. Vogel also wanted Smith's mother to testify, but Smith did not want her mother involved. H. at 179. Vogel was also concerned that petitioner's and Smith's stories differed as to how they met on February 10, 2001:

9

petitioner said it was by chance and Smith said it was planned. H. at 184. As a result, Vogel decided that because petitioner was gainfully employed at the time of his trial, was well spoken, and presented himself well, it would be better to take the missing witness charge than to call Smith. H. at 162-63. Vogel testified that he explained both his reasoning and the missing witness charge to petitioner and that petitioner agreed not to call Smith. H. at 163-65.

On December 14, 2007, the court denied petitioner's motion to vacate pursuant to New York Criminal Procedure Law §440.10(h). While the court found all three witnesses generally credible, the court accepted Vogel's testimony where recollections differed. The court stated that to prevail on a claim on ineffective assistance of counsel, a "[petitioner] must overcome the high burden of demonstrating that he received 'less than meaningful representation,'" and that "all of the evidence must be weighed in context and as of the time of representation . . . ." Order Denying § 440 Mot. at 8, Dec. 18, 2007 (citing to People v. Hobot, 84 N.Y.2d 1021, 1022 (1994)). The court noted that Vogel made reasonable efforts to investigate both petitioner's alibi and the alibi witnesses because he spoke with Briggs, Smith, and Seabrooks. Id. at 9-10. Thus, the court held that petitioner failed to establish that Vogel's investigation of the alibi was so deficient as to rise to the level of ineffective assistance. Id. at 10. The court reasoned that Vogel could not be held ineffective because Briggs refused to testify and Smith refused to provide Vogel's investigator with her mother's address, or to bring her mother to court, despite Vogel's request. Id. at 9.

With regard to Vogel's failure to call Michelle Smith as an alibi witness at petitioner's trial, the court stated "[petitioner] must 'demonstrate the absence of strategic or other legitimate explanations' for the allegedly deficient conduct." Id. at 10 (citing to People v. Caban, 5 N.Y.3d

10

143, 156 (2005)). The court reasoned that the hearing record clearly indicated that Vogel weighed the potential pros and cons of Smith's testimony and made a calculated decision not to have her take the stand because it would undermine, not enhance, petitioner's testimony. Id. at 10. Specifically, the court found that Vogel "considered the differences between Smith's and [petitioner]'s description of the events, Smith's financial dependence on [petitioner], and her statement that she would say anything to help him." Id. Having listened to Smith's testimony and having observed her demeanor, the court determined that Vogel's decision was not objectively unreasonable and, therefore, denied petitioner's motion to vacate judgment. Id. at 10-11.

On February 4, 2008, petitioner filed the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, raising ineffective assistance of counsel.[3]

## DISCUSSION

I. **Merits of Petitioner's Claim**

A. **Standard of Review**

The Antiterrorism and Effective Death Penalty Act (hereinafter "AEDPA") provides that for claims adjudicated on the merits in state court proceedings, like petitioner's instant ineffective assistance of counsel claim, a petitioner must show that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254; Bell v. Cone, 535 U.S. 685, 693-94 (2002).

---

[3] At the time petitioner filed the instant petition for a writ of habeas corpus, he had not yet filed for leave to appeal the decision denying his motion to vacate. However, petitioner subsequently filed for leave to appeal to the Appellate Division, Second Department on February 26, 2008 and leave to appeal was denied on April 16, 2008. Technically, petitioner filed the instant petition prematurely, however his state remedies have since been exhausted.

In Williams v. Taylor, the Supreme Court held that a state court decision is "contrary to" clearly established Federal law if a state court 1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or 2) "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." 529 U.S. 362, 413 (2000). "'Clearly established federal law' in § 2254(d)(1) 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.'" Carey v. Musladin, 549 U.S. 70, 74 (2006)(quoting Williams, 529 U.S. at 412). As to the "unreasonable application" clause, habeas relief is warranted only "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 407, 413.

The reasonableness of the application of the law is to be assessed objectively rather than subjectively. Id. at 409-10. In addition, the Court cautioned that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 410 (emphasis in original). Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Bell, 535 U.S. at 694. The Second Circuit has explained that while "[s]ome increment of incorrectness beyond error is required...the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (quotation and citation omitted).

12

## B. Ineffective Assistance of Counsel

"The Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." Strickland v. Washington, 466 U.S. 668, 684 (1984). The federal standard, established in Strickland, holds that to succeed on an ineffective assistance of counsel claim, defendant must demonstrate "that counsel's representation fell below an objective standard of reasonableness, [which is] simply reasonableness under prevailing professional norms," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 688, 694. However, when ruling on an ineffective assistance claim, a court need not address both components if the defendant fails to make a sufficient showing on either part. Id. at 697.

Following the evidentiary hearing, the state court denied petitioner's motion to vacate finding, *inter alia*, that Vogel was not ineffective for not calling Smith as an alibi witness. Order Denying § 440 Mot. at 11. New York's standard for effective assistance is "so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met." Lindstadt v. Keane, 239 F.3d 191, 198 (2d Cir. 2001) (quoting People v. Baldi, 54 N.Y.2d 137, 147 (1981) (citations omitted)). While the New York standard examines the fairness of the process as a whole and the federal standard set forth in Strickland considers the outcome of the proceeding for the defendant, the Second Circuit has held that the New York standard for ineffective assistance is not "contrary to" the standard set forth in Strickland. Lindstadt, 329 F.3d at 198 ("the standard applied by the state court is not

'diametrically different, opposite in character or nature, or mutually opposed' to the standard articulated in Strickland" (citing Williams, 529 U.S. at 405)); see also Eze v. Senkowski, 321 F.3d 110, 122 (2d Cir. 2003) ("Eze argues that New York's standard for ineffective assistance of counsel is 'contrary to' the federal framework set forth in Strickland . . . We disagree."). Therefore, the state court's decision in this case was not "contrary to" federal law.

Likewise, the state court's decision in petitioner's case was not an unreasonable application of Strickland. To establish ineffective assistance of counsel, petitioner must show that counsel's performance fell below an objective standard of reasonableness. The Strickland Court reasoned,

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

Strickland, 466 U.S. at 688-89. Here, the state court found that Vogel weighed the potential pros and cons of Smith's testimony as an alibi witness and decided not to have her take the stand because it would undermine, not enhance, petitioner's testimony. Order Denying § 440 Mot. at 10. Thus, Vogel's decision not to call Smith to testify was both tactical and calculated to best represent his client. As noted by the state court, "As long as the defense reflects a reasonable and legitimate strategy under the circumstances and the evidence presented, even if unsuccessful, it will not fall to the level of ineffective assistance." Id. at 11 (quoting People v. Benevento, 91 N.Y.2d 708, 712-13 (1998)(internal quotes omitted)).

As reflected in the record, Vogel believed that there were a number of inconsistencies

between petitioner's story and Smith's story as to the events that occurred on February 10, 2001, particularly, how Smith and petitioner met up that day, whether petitioner left the party at any point, and whether petitioner spent the night at Smith's apartment. Vogel was concerned that the assistant district attorney would exploit these inconsistencies to undermine petitioner's credibility on cross-examination. Order Denying § 440 Mot. at 10; Hearing at 159. The state court also acknowledged Vogel's concern regarding Smith's financial dependence on petitioner and that she had told Vogel that she would say anything to help petitioner. Order Denying § 440 Mot. at 10. After hearing Smith's testimony and observing her demeanor on the stand at the 440 hearing, the state court found Vogel's decision not to call Smith reasonable because "Smith was a difficult witness whose testimony was rather too malleable to be entirely credible." Id. at 10-11. Thus, the court determined that "Counsel's decision not to call a witness whose testimony he assessed as weak constitutes a strategic legal decision." Id. at 11.

Moreover, in assessing an attorney's performance, "a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' . . . and may not use hindsight to second-guess his strategy choices." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (quoting Strickland, 466 U.S. at 690). "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citation omitted). In denying petitioner's motion to vacate, the state court wrote: "reviewing courts must avoid confusing true ineffectiveness with mere losing tactics, and must not second-guess counsel's actions and determine with the benefit of hindsight whether another

15

course of action would have been more effective." Order Denying § 440 Mot. at 11. That the jury did not believe petitioner's story as to what occurred on February 10, 2001 is not a basis for finding Vogel ineffective. Although in hindsight, petitioner may believe that Vogel's decision not to call Smith was incorrect, that does not mean Vogel's decision fell below an objective standard of reasonableness that violated petitioner's Sixth Amendment rights. The trial court found that Vogel consulted petitioner about why the missing witness charge was preferable to Smith's testimony and the effect of the charge was factored into Vogel's legitimate strategic choice. Id. at 10.

Finally, there is no reasonable probability that the outcome of the proceeding would have been different but for Vogel's alleged error. Had Smith testified, the outcome would not have been different. As the state court acknowledged, even though it was a single witness case, the people's case was strong. Id. at 11. The court noted "[t]he victim, who had known the [petitioner] for several years, identified him immediately by name and stated accurately that [petitioner]'s mother owned a laundromat. The alibi location was approximately four blocks from the shooting scene and [petitioner] admitted that he left the party briefly. Under these circumstances, Smith's testimony was unlikely to have had any impact." Id.

Therefore, the state court decision was not contrary to or an unreasonable application of clearly established federal law.

## CONCLUSION

Accordingly, the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254 should be denied. Because petitioner has not made a substantial showing of the denial of any constitutional right, it is recommended that no certificate of appealability should be issued. 28 U.S.C. § 2253; see Lozada v. United States, 107 F.3d 1011, 1017 (2d Cir. 1997), abrogated on other grounds, United States v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997) (discussing the standard for issuing a certificate for appealability); see also Lucidore v. N.Y. State Div. Of Parole, 209 F.3d 107, 112-13 (2d Cir. 2000), cert. denied, 531 U.S. 873 (2000). It is further recommended that the Court should certify pursuant to 28 U.S.C. § 1915(a) that any appeal from a judgment denying this petition would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962).

## FILING OBJECTIONS TO THE REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. Any request for an extension of time in which to file objections must be made within the ten (10) day period. Failure to timely file an objection to the Report and Recommendation generally waives any further judicial review. DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000); Spence v. Superintendent, Great Meadow Corr. Fac., 219 F.3d 162, 174 (2d Cir. 2000); see also Thomas v. Arn, 474 U.S. 140 (1985).

/S/
LOIS BLOOM
United States Magistrate Judge

Dated: October 21, 2009
Brooklyn, New York